EEOC Form 5 (5/01)

# AMENDED CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

[ ] FEPA
[X] EEOC 570-2023-00732

Virginia Office of Civil Rights and EEOC
*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Dr. Linda Nwoga | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | Alexandria, VA 22304 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| Northern Virginia Mental Health Institute Advisory Committee Inc. | 15-100 Employees | |

| Street Address | City, State and ZIP Code |
|---|---|
| 3302 Gallows Road | Falls Church, VA 22042 |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

[X] RACE [ ] COLOR [ ] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[X] RETALIATION [ ] AGE [X] DISABILITY [ ] OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 04/11/2022 Latest: 04/05/2023

[ ] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

1. I am a first-generation Nigerian-American female, who is a trained psychologist with my Ph.D. and currently registered to sit for my licensing exam in the Commonwealth of Virginia.

2. I was the only African/Black woman who directly worked on a treatment team as a psychologist/psychology associate II in the Psychology and Forensic Services department and on the NGRI unit at the Northern Virginia Mental Health Institute ("NVMHI").

3. On April 11, 2022, I began working as a Psychology Associate II at NVMHI. I worked successfully in my job position until April 5, 2023, when I was abruptly terminated without any advance notice, because of my disability/race, and in retaliation for my discrimination, harassment, and whistleblower complaints. NVMHI retaliated against me for requests for accommodations stemming from disability issues I developed due to excessive and prolonged mold exposure on the job.

4. Although my role became fully remote, I was initially assigned to office K-212 on April 11, 2022. From the onset of my employment, I expressed concerns to my supervisor, Dr. Azure Baron (Director of Psychology and Forensic Services), that the office was visibly filthy. When she brought me to my assigned office during my first day, I commented that the office was dirty and inquired about taped paper that I observed covering the air vent directly above my desk. Dr. Baron dismissed my concerns and took no immediate action. She failed to provide me with another office space to sit in due to the filthy conditions of my assigned office. Immediately experiencing health issues from the environment, I then took pictures of the office space, and texted them to Dr. Baron's then assistant, Nicole Beard. I requested from Ms. Beard to have the office cleaned and to have the filthy computer equipment replaced.

5. Despite being in good health before working at NVMHI, my health quickly started to decline, and I started to develop multiple respiratory, sinus, gastrointestinal, and eye symptoms due to the poor air quality in my office because of the lack of upkeep with the air ventilation system.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

12/31/2023 [signature]
Date Charging Party Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*
12/31/2023

GIAN-CARLO REYES
NOTARY PUBLIC
Commonwealth of Virginia
ID# 7786062
My Commission Expires
July 31, 2026

**EXHIBIT 1**

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

☐ FEPA

☒ EEOC 570-2023-00732

Virginia Office of Civil Rights and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

6. I developed multiple upper respiratory issues, such as persistent coughing, sinus congestion, chronic post-nasal drip, sneezing, and sore and hoarse throats, as well as migraines, light sensitivity, dry and itchy eyes, upset stomach, etc. I was forced to use some of my sick leave over the next couple of months.

7. On May 30, 2022, I returned to work following the use of some sick leave, and expressed my concerns to the Infectious Disease Control nurse about the poor indoor air quality in my office triggering my respiratory symptoms. Nurse Tipton verbally confirmed that other employees had also previously expressed similar concerns about the poor indoor air quality as well and she provided me with the name and email address of who to contact in the Building and Grounds Department at the hospital to submit a work order request to have the air vents in my office cleaned. I repeatedly requested for a work order to be submitted to clean the air vents in my work office, yet Sheila Kyer initially failed to respond and take action.

8. On June 24, 2022, I called Sheila Kyer, to request that a work order be submitted to have my office's air vent cleaned. Ms. Kyer failed to submit my work order, which I then followed up with her via email on June 27, 2022. She failed to respond to my email, and did not submit my work order request at the time.

9. On or about June 22, 2022, I asked Ms. April Seitz (FOIA Officer) for the results of any prior indoor air quality testing performed in my office, K-212, as well as any records of HVAC repairs on K unit that had been completed within the past 2 years. On July 8, 2022, Ms. Seitz confirmed that there were no records of any indoor air quality testing ever being performed in my work office and she explained that the facility does not perform indoor air quality tests on a regular basis. She also emailed me multiple documents that contained records of recent HVAC repair(s) that occurred on K-unit and the hospital seemingly meeting its air quality standard in accordance with EPA.

10. In early July 2022, I emailed Anthony Thomas, Director of Building and Grounds, and again requested that a work order be submitted to clean the air vents in my office. I received a response from him on July 8, 2022 and he confirmed that a work order would be submitted for the request. Unfortunately, whatever action was taken did not improve the conditions.

11. On July 12 through July 13 and July 19, 2022, I was forced to utilize a few more days of sick leave, due to illness caused by the poor indoor air quality in my work office. On July 19, 2022, Dr. Baron emailed me and claimed that she noticed a pattern of excessive use of leave.

12. On August 2, 2022, I met with Dr. Baron to discuss my use of sick leave. I reported to her my deep concerns about having to use sick leave due to the poor indoor air quality in my work office and the numerous steps I had taken to seek assistance to address the issue (such as correspondence with the Infectious Disease Control Nurse, numerous requests for work orders to clean my office's air vent, and use of my own personal air purifier machine in my work office). During our meeting, Dr. Baron again ignored and brushed off my concerns. She failed to file an injury report after I informed her that my absences from work were due to repeated respiratory illnesses that were triggered by the poor indoor air quality in my work office and resulted in significant respiratory symptoms such as migraines, eye pain and dryness, light sensitivity, breathing difficulties, persistent coughing, chronic post-nasal drip, and fatigue.

PAGE 2 of 9 - SEE CONTINUED SHEET ATTACHED

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

12/31/2023 [signature]

*Date* *Charging Party Signature*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT [signature]

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

12/31/2023

GIAN-CARLO REYES
NOTARY PUBLIC
Commonwealth of Virginia
ID# 7786082
My Commission Expires
July 31, 2026

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (5/01).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII or the ADA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

**NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW**

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

**NOTICE OF NON-RETALIATION REQUIREMENTS**

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

**Amended Charge of Discrimination**

13. After my meeting, Dr. Baron immediately began to retaliate against me. In fact, during the meeting, rather than offering any assistance for the poor indoor air quality causing me to fall ill, or properly file an injury report, she suddenly suggested to me that I needed to consider working on another unit altogether, specifically the Acute Unit as a treatment psychologist/psychology associate instead of my position as a forensic psychologist/psychology associate on the NGRI Unit. I was not seeking a new job; I merely was informing Dr. Baron that my health issues were directly caused by the facility's poor air quality. I sought a safe working environment. Dr. Baron was visibly annoyed and angry that I wouldn't transfer out of her unit.

14. From that point forward, Dr. Baron repeatedly engaged in multiple efforts to sabotage and interfere with my work. She created a toxic and hostile work environment. Just days after reporting to her that my health issues caused by poor indoor air quality in my work office, and seeking possible accommodations, Dr. Baron retaliated against me by instructing me to complete new unnecessary job task(s) never previously needed — setting me up for failure. Suddenly, she required me to complete unnecessary forms for a patient to utilize a privilege level (Unescorted Community – Not Overnight; UCNO) that he had already obtained and had been successfully utilizing for several months without any issues.

15. Specifically, Dr. Baron sent me multiple emails and asked me to complete an addendum to a patient's risk management plan. When I completed the addendum of the risk management plan correctly, she then incorrectly instructed me to include additional information in the document, such as the patient's risk factors for decompensating, his coping skills, etc. A patient's risk factors and coping skills are never included in an addendum for a risk management plan. She then failed to review the completed and revised addendum. When I emailed Dr. Baron on August 4, 2022, to inquire about whether or not she had reviewed the revised addendum since the patient would be using his privilege level the following day, she never responded to my email.

16. My colleague and fellow treatment team member, Ms. Tameka Parker, then contacted Dr. Baron to ask about the status of her review. Dr. Baron suddenly claimed to Ms. Parker that there were errors in the addendum, she would revise it, and then send it out for members of the treatment team to sign later that day. However, Dr. Baron was not honest. The addendum was completed in accordance with her instructions and there were no errors. In reality, Dr. Baron failed to review the document and provide feedback, which is the standard process for all documentation that is submitted to her. Instead, she created her own addendum for the patient's risk management plan and intentionally input the incorrect departure time, 6:00pm (when the correct time and the one that I had included in the addendum I had completed was 6:00am) for when the patient would be


LN
12/31/2023

leaving the hospital to use his privilege level *on the addendum that she created*. She sent out the addendum she created to members of the treatment team and we all signed it by the following morning. Dr. Baron then contacted me the following morning through text message and falsely claimed that I made the error in the departure time of the addendum that she had created for the patient and she claimed he hadn't been approved to use his privilege and would need to report back to the hospital even though the patient had already left to attend a family member's funeral. In reality, there were no errors with the addendum that I had actually worked on, and Dr. Baron falsely smeared me to my colleagues. Dr. Baron herself created the time error in the patient's risk management plan (RMP) addendum and falsely tried to pin her intentional mistake on me.

17. During the course of several months, my respiratory symptoms had progressively worsened. Over time, I began to develop other symptoms, such as chest congestion, light and odor sensitivity, gastrointestinal issues, sleep issues, headaches and migraines, skin issues, persistent fatigue, joint pain, muscle cramps, mood-related issues, etc.

18. On or about November 10, 2023, I received my probationary review of my work performance from Dr. Baron. Dr. Baron used this review to retaliate against me. While the overall review acknowledged I was an overall positive "Contributor" rating, I was concerned about the multiple false and unfair statements in the review, which I believed were retaliatory, and continued inappropriate focus on my use of sick leave. During our meeting to discuss the review, I pointed out that my use of unscheduled leave was actual sick leave that I had already accrued, and my use of sick leave was directly due to occupational health issues I experienced because of the poor indoor air quality in my office. I reiterated that I raised these same issues during our meeting on August 2, 2022 and had emailed Anthony Thomas (Director of Building and Grounds) on September 30, 2022.

19. Following my meeting with Dr. Baron to discuss my probationary review, on or about November 17, 2023, Dr. Baron and Mr. Thomas falsely claimed that the indoor air quality test had been performed in my office and no mold or allergens were found. This was inaccurate. I knew their claim was false because in July 2022, my employer's FOIA officer, Ms. April Seitz, had informed me that no indoor air quality tests had been performed in my work office and NVMHI does not conduct indoor air quality tests on a schedule and such a test had not been conducted in the past two years.

20. About a week later, I met with Ms. Sudipta Upadhyay (HR), to discuss my concerns about the false and inaccurate statements from Dr. Baron in my probationary review, Dr. Baron's failure to assess my performance objectively, and my ongoing complaints/concerns of harassment and retaliation by Dr. Baron after I complained about the poor indoor air quality and sought medical accommodations.


LN
12/31/2023

21. This led to a follow-up meeting on December 2, 2022, in which both Dr. Baron and Ms. Upadhyay responded to me in an aggressive manner and dismissed my concerns about my work environment being the trigger to my ongoing health issues. I asked to be assigned to a new supervisor due to Dr. Baron's discriminatory attitudes and inability to assess my performance objectively. In response, they explicitly threatened my employment, and stated that if that were going to be an issue then I should transfer to another hospital. Ms. Upadhyay and Dr. Baron again lied and claimed that my work office had already been tested in July 2022. I requested a copy of the indoor air quality test, but Ms. Upadhyay said no and stated that I could only view the test results in the room. It was very clear they were trying to silence my complaints about the poor indoor air quality in my work office and expressed desire to work in a safe environment.

22. After the meeting, Dr. Baron emailed me later that afternoon and finally stated that she would have indoor air quality testing performed in my office, K-212. I was disappointed that my health was not made a priority and testing did not occur sooner, given that I had been raising concerns about the condition of my work office since April 2022.

23. On or about December 8, 2022, my work office (K-212) was finally tested for indoor air quality. On or about December 28, 2022, I was verbally informed that they had detected excessive amounts of black mold spores in my office that were in the air duct ventilation. As it turned out, a December 14, 2022 written report of the indoor air quality test from Air Cleaning Technologies, Inc. confirmed that the ***"total airborne mold spore levels in office 212 were 4,240 count/m³, with the predominant spore type Cladosporium at 3,700 count per cubic meter of air. Cladosporium is considered a common indoor mold, but the level determined from the sampling is an excess concern, especially when compared to the sampling results from the adjacent office K214 whereas total spore level were 40 count /m³ and absent any Cladosporium spores. K212 results were also not in compliance with Environmental Analysis Associates, January 2014, Air-O-Cell Method Interpretation Guide, which is a guide to assist with the interpretation of indoor airborne mold spore types and levels, and is further referenced and discussed in this report***." In other words, the report vindicated my concerns and the multiple health/safety complaints I had voiced over the past eight months. Moreover, it suggested that the HVAC duct branch in my office, K212, should be immediately assessed for any damages and breeches that may have allowed for leakage from within the open ceiling plenum space.

24. In late December 2022, I further developed a sinus infection due to prolonged exposure to mold. I was seen by my primary care doctor for treatment on January 7, 2023, and I was diagnosed with acute bacterial sinusitis/rhinosinusitis and a mold allergy. My doctor

LN
12/31/2023

provided me with a letter requesting reasonable accommodations. The letter requested that I be assigned to a new work office that did not share the same HVAC connection as my initial work office on K-unit.

25. At that point, I was assigned to an office on the administrative side of the building. Yet, the office was never set up for me to use, and there was no office desk, working computers, docking station, etc. Left without an office, I was eventually assigned to use the Psychology extern office that was located in the basement. However, this office was also filthy and I began to experience an exacerbation of my respiratory symptoms, particularly as the air was blowing from the HVAC vent.

26. Following a worsening of my symptoms (increased light sensitivity, migraines, wheezing, persistent coughing, etc.), I went back to my primary care provider and had diagnostic imaging, a CT scan, performed on both my lungs and my sinuses. The CT scan of my sinuses indicated that I had significant multiple bilateral sinus blockages in the ethmoid and maxillary sinus cavities. ***I was medically diagnosed with an Allergic Fungal Sinusitis, a type of chronic sinusitis that was associated with my current and long-lasting rhinosinusitis that was caused by prolonged exposure to the elevated mold levels in my initial work office, K-212, and the presence of mold in the other work offices I was assigned to***, such as the Psychology Extern office (AB-7).

27. Thereafter, on or about February 12, 2023, I submitted a formal request to my employer for reasonable accommodations from my doctor for 100% telework. At that time, it would have been detrimental to my health to have continued working under the existing conditions on-site at the hospital. I submitted my medical documentation to the HR Director, Eileen Elliot, on February 13, 2023.

28. In early January 2023, I also emailed the HR Director, Eileen Elliot, to request to be assigned to a new supervisor due to the retaliatory harassment by Dr. Baron. ***I complained about harassment and discrimination based on my health, disabilities, as well as race.*** The HR Director refused to take any action or to assign me a new supervisor. I emailed supporting documentation regarding my discriminatory/harassment complaint against Dr. Baron, in addition to a complaint regarding her misconduct pertaining to patient care. Other employees, including the members of my treatment team, also filed complaints against Dr. Baron. Ms. Elliot failed to investigate the discrimination and harassment complaints.

Other colleague informed me that Dr. Baron was badmouthing me in retaliation for my complaints. Those colleagues relayed to me how Dr. Baron told Ms. Smiley that I was

LN
12/31/2023

somehow "***dangerous,***" which Ms. Smiley then repeated to my colleagues. She would not have called a white person "dangerous," and she used racially coded language to describe me in an inflammatory manner to other employees in the hospital. I believe this was clearly discriminatory racial profiling against me as a black woman.

29. On January 12, 2023, I met with both Ms. Elliot (white) and the Facility Director, Amy Smiley (white), regarding the lack of action regarding my complaints. I complained about inequitable treatment between me and my white colleagues. I had learned that ***two White employees who worked in my department, Ms. Ashley Clark and Ms. Jessica Meyers, openly used the N-word in the office while referring to black people and while in the presence of Black colleagues. Ms. Clark claimed it was acceptable for her to use this racial epithet because she "dated Black men." Ms. Meyers laughed inappropriately while she used the racial epithet and management officials failed to hold her accountable for such offensive language after Black employees reported the incident because of their awareness of some of her personal issues.***

30. On February 13, 2023, I received an email from Dr. Baron and was told that my request to telework that day had been denied, but that HR would still be reviewing my accommodation requests. ***Later that day, I received a call from Ms. Elliot stating that my request for accommodation to telework had been approved*** and that indoor air quality tests would now be scheduled for offices AB-7 and E-208. Indoor air quality tests performed in both offices, AB-7 and E-208, found that there were mold spores present in both offices. The presence of mold spores in both offices further exacerbated the health issues I was dealing with after prolonged mold exposure in my initial work office, K-212.

31. On February 27, 2023, I filed a complaint against Dr. Baron with Virginia's Office of the State Inspector General (OSIG). I followed up with Virginia State Senator Richard Saslaw's office through email on March 20, 2023 to obtain contact information for OSIG so that I could directly follow up with someone in that office about the status of my complaint. I received a response from one of his legislative assistant's, Ms. Megan Center, and she provided me with the contact information for Mr. Keith Davies, Healthcare Compliance Manager with OSIG. I directly called Mr. Davies in late March and early April 2023 to inquire about the status of my OSIG complaint. He eventually called me in mid-April 2023 and stated he would assign an investigator to look into the complaint I had filed and have the assigned investigator contact me. I believe that one of the reasons why I was terminated from my job was in retaliation for filing the OSIG complaint against Dr. Baron.

LN
12/21/2023

32. Critically, all my job functions could be performed remotely. I successfully teleworked 100% of the time without issues for over six weeks between early February and late March 2023. I had complete access to electronic health records from home and could use Microsoft Teams to meet with any patients or teammates. This became standard following the pandemic. I was not expected to provide any in-person coverage on the department rotation. This was not part of the job.

33. On March 2, 2023, I submitted further medical documentation from my doctor to support the reasonable accommodation of telework from my doctor, which explained that I was not permitted to work on-site at NVMHI at that time, due to my diagnosis of Allergic Fungal Sinusitis and that it was medically necessary for me to work remotely. My doctor stated, "***it is clear that the mold exposure from working at the Northern Virginia Mental Health Institute is responsible for the patient's symptoms***."

34. Suddenly, out of the blue, without any advanced warning, on March 31, 2023, while I was out on approved leave, Dr. Baron wrote a letter stating that my medical reasonable accommodation of telework would no longer be approved by NVMHI and I would need to return back to work on-site on April 5, 2023, or else I would be terminated.

35. On or about March 27, 2023, I received an email and a meeting invite from Eileen Elliot and Dr. Baron for a joint meeting to occur on March 29, 2023. I informed both of them directly that I was requesting leave for March 29 and March 31, 2023. I further explained that I had no additional medical documentation to provide at the current time since I had yet to be seen by my Otolaryngologist, who would be able to provide more clarity about my medical condition, since he was an ear/nose/throat specialist and my first appointment was scheduled on April 4, 2023. I requested for the meeting to be rescheduled for a date after my Otolaryngologist appointment. Dr. Baron expressed an understanding of the information I had shared with both her and Ms. Elliot. She cancelled the joint March 29, 2023, meeting and approved my leave requests for March 29 and March 31, 2023.

36. I was out of the office for approved leave. Unfortunately, my respiratory symptoms worsened and I was seen by my primary care doctor for an urgent medical appointment on April 3, 2023. My employer, NVMHI, knew I was out of the office due to illness on April 3 through April 5, 2023. I did not see my emails while out on sick leave. I had an appointment with my Otolaryngologist on April 4, 2023, which was then rescheduled for April 5, 2023, and I sent Dr. Baron and Ms. Elliot an email that informed them of the situation.

LN
12/31/2023

37. To my utter shock and dismay, on April 6, 2023 I checked my email and learned that I had been terminated the day prior. I was stunned and mortified. The termination letter revoked my accommodations and terminated me without any opportunity to discuss or dialogue. I had been successfully performing my job remotely for nearly two months without any problems. All my job functions had been performed remotely without issues. NVMHI leadership had specifically approved me for telework previously because my duties were all able to be performed remotely.

38. ***Most critically, NVMHI had granted 100% telework to other employees in the same or similar psychologist positions with the facility***. There is no reason they could not have accommodated me for a longer period. For example, Dr. Anita Trivedi had less years of professional experience than me but was granted 100% telework as a reasonable accommodation in the same job. Her work actually had a greater degree of clinical acuity than mine since her patients were admitted directly from the community. It is wrong that she was accommodated but I was not.

39. I was illegally discriminated against on the basis of my disability and retaliated against for requesting medical accommodations, *i.e.*, engaging in protected activity, in violation of the Americans with Disabilities Act of 1990, as amended, and the Virginia Human Rights Act. I was also illegally discriminated against on the basis of my race in violation of Title VII of the 1964 Civil Rights Act, and Virginia Human Rights Act. I endured a hostile work environment because of my disabilities and race.

40. NVMHI further violated the ADA by failing to engage in the interactive process. ***My former employer suddenly revoked my accommodations without any legitimate justification, and did not even give me a chance to respond to or discuss alternatives, knowing that I was out on leave***. There was no interactive process. I was wrongfully terminated because of my disabilities, complaints regarding my health/disabilities/hostile work environment, previously filed complaint against Dr. Baron with the Office of the State Inspector General's office, and my need for accommodations.

LN
12/31/2023

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 570-2023-00732 |

**Virginia Office of Civil Rights** and EEOC

*State or local Agency, if any*

| I Name *(indicate Mr., Ms., Mrs., Miss, Mx., Dr., Hon., Rev.)* | Home Phone | Year of Birth |
|---|---|---|
| Dr. Linda Nwoga | | |

Street Address

ALEXANDRIA, VA 22304

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| NORTHERN VIRGINIA MENTAL HEALTH INSTITUTE ADVISORY COMMITTEE INC | 15 - 100 Employees | |

Street Address

3302 GALLOWS RD

FALLS CHURCH, VA 22042

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

Street Address City, State and ZIP Code

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Disability | 04/01/2022 | 04/05/2023 |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct.<br>**Digitally Signed By: Dr. Linda Nwoga**<br>**09/13/2023**<br>*Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br>EEOC<br>FEPA | Agency(ies) Charge No(s):<br>**570-2023-00732** |
|---|---|---|
| **Virginia Office of Civil Rights**<br>*State or local Agency, if any* | | and EEOC |

I began employment with the above-mentioned on April 1, 2022, as a Treatment Psychologist.

In or around February 2023, I was approved for an ADA accommodation to telework. The Respondent was aware of my disability and the need for accommodation. My accommodation request was initially approved but then I was subsequently terminated on April 5, 2023.

I believe I was discriminated against on the basis of my disability and retaliated against for engaging in protected activity, in violation of the Americans with Disabilities Act of 1990, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct.<br><br>**Digitally Signed By: Dr. Linda Nwoga**<br>**09/13/2023**<br><br>*Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Washington Field Office**
131 M Street, NE Fourth Floor, Suite 4NWO2F
Washington, DC 20507
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 05/10/2024

**To:** Dr. Linda Nwoga

Alexandria, VA 22304

Charge No: 570-2023-00732

EEOC Representative and email: ALLENZA BRIZARD
Investigator
allenza.brizard@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 570-2023-00732.

On behalf of the Commission,

Digitally Signed By:Mindy E. Weinstein
05/10/2024

Mindy E. Weinstein
Director

**EXHIBIT 2**

**Cc:**
Leigh Lyons
VA Department of Behavioral Health & Developmental Services
1220 BANK ST FL 3
Richmond, VA 23219

Amy T Smiley
Northern Virginia Mental Health Institute
3302 Gallows Rd
Falls Church, VA 22042

Lindsay Freedman
Freedman Law, LLC
10015 Old Columbia Road Suite B-215
COLUMBIA, MD 21046

Please retain this notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 570-2023-00732 to the

District Director at Mindy E. Weinstein, 131 M Street, NE Fourth Floor Suite 4NWO2F, Washington, DC 20507.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 570-2023-00732 to the District Director at Mindy E. Weinstein, 131 M Street, NE Fourth Floor Suite 4NWO2F, Washington, DC 20507.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

## NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.
- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.