IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| LINDA NWOGA, ) | |
| ) | |
|     *Plaintiff*, ) | |
| ) | Case No. 1:24-cv-1393-AJT-IDD |
| v. ) | |
| ) | |
| NORTHERN VIRGINIA MENTAL ) | |
| HEALTH INSTITUTE ET AL., ) | |
| ) | |
|     *Defendants*. ) | |

## MEMORANDUM OPINION AND ORDER

On August 8, 2024, Plaintiff Linda Nwoga ("Nwoga") brought this civil action alleging the Defendants violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the Americans with Disabilities Act of 1990 ("ADA"), and Virginia common law. [Doc. No. 1], in response to which Defendant Northern Virginia Mental Health Institute ("NVMHI") and Defendant Nelson Smith in his official capacity as the Commissioner of the Virginia Department of Behavioral Health and Developmental Services ("DPB") (collectively the "Defendants") have filed a Motion to Dismiss, [Doc. No. 11] (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). [Doc. No. 12] at 2.[1] For the reasons stated below, the Motion, [Doc. No. 11], is, **GRANTED IN PART** and **DENIED IN PART**.

### I. BACKGROUND

In her Complaint, Nwoga alleges the following:

DPB is a Virginia state agency that provides psychological care to individuals with behavioral health disorders and developmental disabilities. [Doc. No. 1] ¶ 13. NVMHI is a

---

[1] The Motion is fully briefed, [Doc. Nos. 11-12, 16-17], and the Defendants have waived a hearing on the Motion. [Doc. No. 13].

subsidiary of DPB and operates as a residential psychiatric treatment facility. *Id.* ¶ 14. From April 10, 2022 to April 5, 2023, Nwoga was a psychology associate at NVMHI. *Id.* ¶¶ 15, 50. At NVMHI, Nwoga was responsible for completing psychological evaluations and planning treatments and psychotherapeutic services for patients. *Id.* ¶ 16. Nwoga is a Black, Nigerian American woman. *Id.* ¶ 12.

In or around May 30, 2022, Nwoga told a coworker that Nwoga noticed persistent air quality issues in her office and began experiencing respiratory symptoms from it. [Doc. No. 1-2] at 2. Nwoga's coworker informed Nwoga that other employees had similar issues and suggested Nwoga request the Building and Grounds Department clean the vents in Nwoga's office. *Id.* Nwoga submitted a request for vent cleaning, but it took approximately a month before any action was taken. *Id.* However, even after the vents were cleaned, Nwoga continued to experience respiratory issues and had to use personal leave on various occasions because of these issues. *Id.*

On August 2, 2022, Nwoga reported that she had concerns about the air quality in her office to Dr. Azure Baron, the Director of Psychology and Forensic Services. [Doc. No. 1] ¶¶ 20-21. Dr. Baron did not submit an injury report detailing Nwoga's concerns and suggested that Nwoga work in a different unit outside of Dr. Baron's supervision. *Id.* ¶ 22. Following this report, Dr. Baron showed increased hostility to Nwoga, created unnecessary job tasks, and scrutinized Nwoga's work product unfairly. *Id.* ¶ 22; *see also* [Doc. No. 1-2] at 4.

Nwoga continued raising her air quality concerns, and on November 17, 2022,[2] Dr. Baron and Anthony Thomas, Director of Building and Grounds, informed Nwoga that there were no mold

---

[2] The Complaint alleges that this occurred on November 17, 2023; however, given Nwoga was no longer employed as of this date, the Court believes this was a topographical error and Plaintiffs meant to allege this occurred 2022, and assumed such in drafting this Order.

or allergens detected in her office, which Nwoga asserts was a false statement.[3] [Doc. No. 1] ¶ 23. Subsequently, Nwoga met with Dr. Baron and Sudipta Upadhyay, a human resources employee, to discuss Nwoga's air quality concerns; but the meeting merely informed Nwoga that "if [Nwoga] was going to make an issue of her workplace environment and health issues then Plaintiff should transfer to another hospital." *Id.* ¶ 24. In or around December 8, 2022, air quality testing revealed high mold levels in Nwoga's office.[4] *Id.* ¶¶ 31, 38.

As a result of the extensive exposure to mold, in or around January 7, 2023, Nwoga's physician diagnosed her with recurrent long-lasting rhinosinusitis and mold allergies. *Id.* ¶¶ 18, 32; *see also* [Doc. No. 1-3] at 1-4. As a result of these diagnoses, Nwoga experienced issues breathing, thinking, concentrating, and working due to the respiratory, sinus, gastrointestinal, and eye symptoms. [Doc. No. 1] ¶ 32. Around the same time, Nwoga also reported that she believed she was experiencing racial discrimination, disability discrimination, and retaliation for reporting air quality concerns to human resources on two occasions. *Id.* ¶¶ 25, 29. Nwoga also reported that she learned that two colleagues used the n-word, in the presence of other Black employees, but not Nwoga. [Doc. No. 1-2] at 8. After Nwoga reported her concerns to human resources, Dr. Baron "spoke[] negatively" of Nwoga, including referring to Nwoga as "dangerous," which Nwoga alleges was motivated by discriminatory animus. *Id.* ¶¶ 26-28.

Due to Nwoga's diagnosis, Nwoga's physician recommended that Nwoga move to a new office, which Defendants facilitated. *Id.* ¶ 37. However, air quality testing revealed that the new office also contained mold spores which exacerbated Nwoga's conditions. *Id.* ¶ 40. Nwoga's

---

[3] Nwoga alleges that this report was false based on a conversation that Nwoga had with the FOIA office months earlier, in which Nwoga learned that no air quality testing was completed in the last two years for Nwoga's office. *Id.;* [Doc. No. 1-2] at 5. This is consistent with the subsequent allegations that in or around December 8, 2023, high levels of mold were found in Nwoga's office. *See* [Doc. No. 1-2] at 6.

[4] The test results found that Nwoga's office had a mold spore count of 4,240 count/m$^3$, compared to a neighboring office only having a mold spore count of 40 count/m$^3$. [Doc. No. 1-2] at 6.

physician then requested that Nwoga be permitted to work remotely. *Id.* ¶¶ 39, 41, 44. Defendants agreed to allow Nwoga to work remotely beginning on February 13, 2023. [Doc. No. 1-2] at 8. On February 27, 2023, Nwoga also reported Dr. Baron to the Virginia State Office of the State Inspector General, which Dr. Baron subsequently learned of.[5] [Doc. No. 1] ¶¶ 42-43.

Nwoga teleworked full time after February 13, 2023, and alleges that she was able to complete all essential functions of her job remotely. [Doc. No. 1-2] at 9. Another NVMHI employee with the same or substantially similar position and duties as Nwoga, Dr. Anita Trivedi, also teleworks full-time. [Doc. No 1] ¶ 52. However, on March 31, 2023, Dr. Baron informed Nwoga that she must return to work in person by April 5, 2023 or Nwoga's employment would be terminated. *Id.* ¶ 47. In a letter to Nwoga, NVMHI explained that it could not offer her full-time, permanent teleworking because certain patient assessments and job duties required her in-person presence. [Doc. No. 1-3] at 9. Nwoga explained she needed additional time to receive further medical evaluation before returning and did not return to work on April 5, 2023. [Doc. No. 1] ¶¶ 48-49. On April 5, 2023, NVMHI terminated Nwoga's employment, citing that NVMHI was no longer able to accommodate Nwoga's telework due to "[Nwoga's] essential job functions and [NVMHI's] business needs." [Doc. No. 1-3] at 8; [Doc. No. 1] ¶ 50.[6]

In her Complaint, [Doc. No. 1], Nwoga's complaint alleges discrimination in violation of Title VII on the basis of Nwoga's race (African), color (Black), and national origin (Nigerian-American) (Count I); retaliation in violation of Title VII (Count II); unlawful race discrimination in contract in violation of 42 U.S.C. § 1981 (Count III); violations of the ADA for disability

---

[5] The Complaint does not specify what concerns were raised in this report.
[6] Nwoga filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 13, 2023. [Doc. No. 1] ¶¶ 8-9. Nwoga subsequently amended the Charge of Discrimination. *Id.*; [Doc. No. 1-2] at 1. On May 10, 2024, the EEOC issued Nwoga's right to sue letter, [Doc. No. 1] ¶ 10.

discrimination, failure to provide reasonable accommodations, and retaliation (Counts IV-VI); and wrongful discharge in violation of Virginia public policy (Count VII). *Id.*

## II. LEGAL STANDARD

A. Motion to Dismiss Pursuant to 12(b)(1)

A motion to dismiss pursuant to 12(b)(1) should be granted where a court lacks jurisdiction to hear any or all claims before it. FED. R. CIV. P. 12(b)(1). When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

Where sovereign immunity applies, a federal court is deprived of subject matter jurisdiction. *Cunningham v. Gen. Dynamics Info. Tech, Inc.*, 888 F.3d 640, 649 (4th Cir. 2018). Sovereign immunity arises from the Eleventh Amendment of the United States Constitution, which provides "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.

The Eleventh Amendment also gives states sovereign immunity. *Hans v. Louisiana*, 134 U.S. 1, 15 (1890); *see also Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 360, 363 (2001). A state agency is entitled to sovereign immunity when it is an "arm of the State," *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993); which is found where any judgment would be paid from the state treasury, *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 223-224 (4th Cir. 2001); or by evaluating the relationship between the agency and the state, including "(1) the degree of control that the State exercises over the entity or the degree

5

of autonomy from the State that the entity enjoys; (2) the scope of the entity's concerns—whether local or statewide . . . and (3) the manner in which State law treats the entity." *Id.* at 224.

### B. Motion to Dismiss Pursuant to 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). A motion under 12(b)(6) tests the legal sufficiency of the complaint, *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994), and should be granted where the allegations in the complaint do not plead a plausible claim for relief. *See* FED. R. CIV. P. 12(b)(6). In evaluating a motion to dismiss, the court should accept all well-pled allegations as true and draw all favorable inferences in favor of the non-moving party. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the pleading standard does not invoke a probability requirement, it requires more than threadbare accusations that the defendant acted unlawfully. *Id.* Where a complaint contains sufficient factual allegations to state a plausible claim for relief, the case should continue to the next stage of litigation. *Id.* at 679.

### C. Motion for Leave to Amend a Complaint Pursuant to Rule 15

After a defendant files a responsive pleading, a plaintiff may only amend their pleadings only with the court's leave or by consent. FED. R. CIV. P. 15(a)(1)(2). Courts should "freely live leave when justice so requires." *Id.* In the Fourth Circuit, a court may only deny a request for leave to amend a pleading "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). An amendment is deemed futile if it "is clearly insufficient or frivolous on its face." *Id.* at 510. When considering futility, a court should deny a motion to amend if it is apparent

that "the proposed amendments could not withstand a motion to dismiss." *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995).

### III. DISCUSSION

<u>A. The Court lacks jurisdiction to hear Nwoga's Section 1981 (Count III) and ADA Claims (Counts IV, V, and VI).</u>

Defendants argue that the Court lacks jurisdiction to hear Nwoga's Section 1981 and ADA claims because sovereign immunity applies. [Doc. No. 12] at 2, 7. Nwoga concedes that the ADA has not abrogated state sovereign immunity, but instead, requests leave to amend the Complaint to instead bring the claims under the Virginia Human Rights Act ("VHRA"). [Doc. No. 16] at 3-4. Defendants' reply argues that the proposed amendment for VHRA claims would be futile because sovereign immunity would still bar any VHRA claims, and Nwoga failed to administratively exhaust any VHRA claims. [Doc. No. 17] at 3.

The DPB and NVMHI are Virginia state agencies, [Doc. No. 1] ¶ 13, funded, in part, by the Virginia legislature,[7] and are thereby entitled to state sovereign immunity. *See Cash*, 242 F.3d at 223-224. Neither the ADA nor Section 1981 abrogate Virginia's right to sovereign immunity; therefore, the Court lacks jurisdiction to hear these claims.[8] *See Garrett*, 531 U.S. at 374 (ADA); *Allen v. Coll. of William & Mary*, 245 F. Supp. 2d 777, 790–91 (E.D. Va. 2003) (Section 1981). Further, because the claims against Commissioner Smith are brought in his official capacity, these claims are similarly barred by state sovereign immunity. *See Alden v. Maine*, 527 U.S. 706, 757

---

[7] *See CSB Resource Request Opportunities*, VA. DEP'T OF BEHAVIOR HEALTH & DEVELOPMENTAL SERV, https://dbhds.virginia.gov/csbrequest/#:~:text=DBHDS%20is%20the%20pass%20through,health%20and%20developmental%20services%20system (last visited Dec. 31, 2024).

[8] Nwoga cites to statutory language from the ADA that supports the view that Congress did intend to abrogate sovereign immunity; however, the Supreme Court determined that Congress exceeded its authority in doing so. *Bd. of Trustees v. Garrett*, 531 U.S. 356, 374 (2001).

(1999). Therefore, Counts III, IV, V, and VI must be dismissed for lack of subject matter jurisdiction.

Nwoga similarly cannot avoid state sovereign immunity principles by instead bringing her claims under the VHRA. *See Patel v. Commonwealth*, No. cl21-6527, 2021 WL 2808929 (Va. Cir. July 2, 2021). Therefore, Nwoga's request for leave to amend the Complaint as to Counts IV, V, and VI are denied as any such amendment would be futile. *See Oroweat Foods*, 785 F.2d at 510.

### B. Nwoga failed to administratively exhaust her national origin claim but properly exhausted and plausibly alleged race and color discrimination (Count I).

Nwoga alleges that Defendants discriminated against her because of her race (African), color (Black), and national origin (Nigerian American). [Doc. No. 1] ¶ 1. Defendants first argue Nwoga has failed to administratively exhaust her color and national origin claims with the EEOC prior to bringing this action. [Doc. No. 12] at 8-9. Defendants then argue that Nwoga has not plausibly alleged that race discrimination motivated her firing. *Id.* at 10. Nwoga argues that the color and national origin claims are "closely related" to her exhausted race claims, such that they were sufficiently identified in the charge of discrimination. [Doc. No. 12]. Then, Nwoga argues that although she believes the race claim was plausibly alleged, she can amend the complaint with additional details; although, she does not identify what additional information may be added. *See id.*

#### 1. National Origin Claim

Before a plaintiff has standing to file claims under Title VII, they must administratively exhaust by filing a charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000E-5(b); *Bryant v. Bell Atl. Md., Inc.*, 288, F.3d 124, 132 (4th Cir. 2002). The charges and claims identified in the charge of discrimination "do[] not strictly limit a Title VII suit . . . rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be

expected to follow the charge of discrimination." *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981).

In Nwoga's amended charge of discrimination, she selected that the basis for her claims were "race, retaliation, [and] disability." [Doc. No. 1-2] at 1. Although not selecting national origin discrimination as a basis for her claim is not necessarily dispositive, Nwoga also included a six-page addendum to the charge of discrimination which does not reference any comments or behavior that would reasonably lead an EEOC counselor to investigate concerns of national origin discrimination.[9] Therefore, Nwoga has not administratively exhausted her national origin claim, and therefore, it must be dismissed.[10]

### 2. Race and Color Discrimination Claims

As discussed above, Nwoga's charge of discrimination properly exhausts her race discrimination claims, *see id.*, and it is likely that an administrative investigation into color discrimination was reasonably expected to follow based on the facts contained in Nwoga's declaration, which was attached to the charge of discrimination. *See id.* at 2, 4-10. Therefore, Nwoga has properly exhausted these claims.

Discrimination claims may be proven through either direct or indirect evidence of discrimination. In this case, there is no direct evidence that racial discrimination motivated Nwoga's firing, so the *McDonnell Douglas* burden-shifting framework applies.[11] At the first step,

---

[9] Discrimination on the basis of national origin arises when the discrimination is motivated by "where a person was born, or more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Manuf. Co.,* 414 U.S. 86, 88 (1973). Although some of the details contained in Nwoga's charge of discrimination indicate that there may be some racial animus in the company, *see* [Doc. No. 1-2] at 8, this comment was not directed to a particular national origin.

[10] Even if these claims were administratively exhausted, the Complaint does not state any allegations that give rise to a plausible allegation of national origin discrimination.

[11] Under the framework, a plaintiff must first set forth a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). After that, the defendant must produce a legitimate non-discriminatory reason for the adverse employment action. *Id.* Finally, the plaintiff bears the burden of persuasion that discrimination was the true reason for the discrimination. *Id.* At this stage, only analysis of the first step is necessary.

9

Nwoga must plead a *prima facie* case of discrimination; however, because this a motion to dismiss, Nwoga does not need to specifically allege each element of the prima facie case to proceed, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002), but must allege sufficient factual allegations to plausibly allege discrimination. Accordingly, the *prima facie* analysis remains one of the most straightforward means to do so.

To survive the Motion, Nwoga's complaint must plausibly allege "(1) membership in a protected class [i.e., race or color]; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Robinson v. Loudon Cnty. Pub. Sch.*, No. 1:16–cv–1604, 2017 WL 3599639, at *3 (E.D. Va. Aug. 18, 2017). Nwoga has plausibly alleged that she is Black, met all performance expectations, and faced an adverse employment action when she was fired. [Doc. No. 1] ¶¶ 12, 17, 44-46, 50; *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006). Nwoga also alleges that a non-African and non-colored employee was permitted to telework full-time, even though Defendants cite that Nwoga's firing was motivated because Nwoga would not return to in person work.[12] [Doc. No. 1] ¶¶ 50, 52; [Doc. No. 1-3] at 8-9. Therefore, at this stage, Nwoga has alleged a plausible claim of race and color discrimination.

---

[12] Nwoga also alleges that Dr. Baron spoke negatively of her, called her "dangerous," and heard that other co-workers outside of Nwoga's presence used the n-word in the presence of other Black employees. [Doc. No. 1] ¶ 27; [Doc. No. 1-2] at 8. Dr. Baron's comments were made months before the alleged firing decision occurred and raise little, if any, inference of discriminatory animus. Further, the comments of other co-workers, outside of Nwoga's presence and not made about Nwoga, while racially charged and disparaging, are not, alone, sufficient to show that Nwoga's firing was motivated by Nwoga's race. *See Dawson v. Rumsfeld*, No. 1:05CV1270, 2006 WL 325867, at *4 (E.D. Va. Feb. 8, 2006) (determining that the mere use of a racial slur in the workplace that was not directed towards the plaintiff or made in the plaintiff's presence cannot independently support a claim).

C. Nwoga has not plausibly stated a claim of retaliation (Count II) but may amend the claim

Nwoga's second claim alleges that the Defendants violated Title VII by retaliating against her for reporting concerns of workplace discrimination.[13] [Doc. No. 1] ¶ 61. To plausibly allege a Title VII retaliation claim, Nwoga must allege facts that (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; and (3) there is a causal link between the protected activity and materially adverse employment action. *See Rivera v. Dep't of Def.*, No. 3:24cv646, 2024 WL 4894848, at *6 (E.D. Va. Nov. 26, 2024). Defendants argue that Nwoga's retaliation claim fails to plausibly allege a causal connection between Nwoga's protected activity and the firing. [Doc. No. 12] at 10-11.

First, Nwoga engaged in protected activity. "Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'" *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (quoting *Balazs v. Liebenthal*, 32 F.3d 151, 159 (4th Cir. 1994)). Internal complaints to management may be protected activity. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). In January 2023, Nwoga informed human resources that she believed she was facing racial discrimination, disability discrimination, and perceived disparate treatment, which is sufficient to plausibly allege protected activity. [Doc. No. 1] ¶¶ 25, 29.

Second, Nwoga experienced a materially adverse employment action. A materially adverse action includes any action that could "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57. Most of the allegations in Nwoga's

---

[13] Nwoga also alleges that this retaliation occurred for reporting her concerns of workplace safety. [Doc. No. 1] ¶ 61. However, because these workplace safety concerns are not an alleged violation of Title VII, they cannot serve as the basis of a retaliation claim. *See* 42 U.S.C. § 2000e–3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice *by this subchapter*." (emphasis added)).

11

complaint concern actions taken by Dr. Baron before Nwoga reported her concerns of discrimination to human resources. *See* [Doc. No. 1] ¶¶ 21-22, 24. The only plausible allegations of retaliation that occurred after Nwoga's report include Dr. Baron calling Nwoga "dangerous" before firing Nwoga approximately three months later. [Doc. No. 1-2] at 8, 10. Although the former comment is insufficient to be a materially adverse employment action, Nwoga's firing is sufficient to plausibly establish a materially adverse employment action. *See Burlington*, 548 U.S. at 57.

However, Nwoga has not established a causal link between her protected activity and firing. Establishing the causal link between the protected activity and materially adverse action is not onerous and can be demonstrated through temporal proximity or other facts to raise the causal link. *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021). However, where a plaintiff relies exclusively on temporal proximity to show a causal connection, "the temporal proximity must be 'very close,'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation omitted), and a lapse of three months will not support finding causation without additional facts. *Roberts*, 998 F.3d at 127. In this case, Nwoga was fired over three months after reporting her complaints of discrimination. *See* [Doc. No. 1] ¶¶ 25, 29, 50. Further, there are no additional facts alleged that show Nwoga's January 2023 reports of discrimination motivated the firing. On these facts, Nwoga has not plausibly alleged that her reports of discrimination motivated her firing. Nevertheless, the Court will grant Nwoga leave to amend her retaliation claim, if she can do so in good faith.

D. Nwoga has not alleged a valid Bowman claim (Count VII)

Nwoga's final claim alleges that she was wrongfully discharged in violation of Virginia public policy, colloquially known as a "Bowman claim." [Doc. No. 1] ¶ 4. Virginia recognizes a strong presumption that employment is at-will; however, this presumption may be overcome where an employee's termination from employment violates "Virginia public policy as expressed in a

12

Virginia statute." *Mirashahi v. Patient First Richmond Med. Grp., LLC*, No. 3:23cv495, 2024 WL 3823991, at *5 (E.D. Va. Aug. 13, 2024) (citing *Hice v. Mazzella Lifting Techs., Inc.*, 589 F. Supp. 3d 539, 550 (E.D. Va. 2022)). The Supreme Court of Virginia has recognized three ways that an employee's termination violates public policy:

> (1) where an employer fired an employee for exercising a statutorily created right ("statutory right Bowman claim");
> (2) where the public policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy" ("employee public policy Bowman claim"); or,
> (3) "where the discharge was based on the employee's refusal to engage in a criminal act" ("refusal to commit crime Bowman claim").

*Id.* Nwoga's Bowman claim falls in the second category, which is exceedingly narrow. *See id.* at *6. An employee public policy Bowman claim is only valid where the cited statute contains no internal statutory remedy for vindicating the statute's public policy goals. *Sch. Bd. of City of Norfolk v. Giannoutsos*, 380 S.E.2d 647, 649 (Va. 1989).

Nwoga points to the Virginia Occupational Safety and Health Program ("VOSH") and the federal Occupational Safety and Health Act of 1970 ("OSHA") as statutes which raise public policy goals meant to protect employees from retaliation for raising safety concerns. [Doc. No. 1] ¶¶ 84-85. However, both VOSH and OSHA contain internal statutory remedies and cannot serve as the basis for a valid Bowman claim. *See Williams v. TMS Int'l, LLC*, No. 3:21cv260, 2021 WL 4071868, at *5-6 (E.D. Va. Sept. 7, 2021) (VOSH); *Frechette v. Blue Ridge Hospice*, No. 5:24-cv-00051, 2024 WL 4775101, at *9 (W.D. Va. Nov. 13, 2024) (same); *Hill v. Meharry Med. Coll.*, No. 3:23CV415, 2024 WL 23148, at *7 (E.D. Va. Jan. 2, 2024) (OSHA). Nwoga also has not identified any other Virginia statute with an applicable public policy, so any amendment would be futile. *See Frechette*, 2024 WL 4775101, at *9. Therefore, this count is dismissed with prejudice.

## IV. CONCLUSION

For the above reasons, it is hereby

**ORDERED** that the Motion, [Doc. No. 11], be, and the same hereby is, **GRANTED IN PART** and **DENIED IN PART**. The Motion is **DENIED** as to Count I for race and color discrimination, and **GRANTED** for all other counts; and it is further

**ORDERED** that Plaintiff is granted leave to amend Count II within fourteen (14) days of the date of this Order.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

January 21, 2025
Alexandria, Virginia

_____
Anthony J. Trenga
Senior U.S. District Judge